is Thompson versus Bebout number 5-11-41. Party's ready to proceed. Mr Wittig announcing that quickly. You may proceed, sir. Your Honor, this case began as a result of a warranty from Barbara Mitchell conveying approximately 10 acres of real property to the plaintiff. The plaintiffs believed that they were the owners of approximately one acre of that real estate. And defendant was speak up a little because you're going to record it was the actual owner of only nine acres. Plaintiffs filed a suit to reform the deeds and to determine adverse position. Defendant counterclaimed. During the pendency of that suit, there was a discovery deposition conducted of the defendant. That discovery deposition took took place at plaintiff's attorney's office and was controlled by plaintiff's attorney. The this appeal basically concerns what occurred at the end of that deposition. The plaintiffs contend that an enforceable moral agreement was entered into. Defendants contend otherwise. Our defendant contends otherwise. Needless to say, the defendant did not abide by the terms of that so called agreement. And when that didn't occur, plaintiff filed a motion to enforce that settlement. Defendant filed a response with a memorandum affidavit. Argument was heard. Trial court granted plaintiff's motion to enforce the settlement. And this appeal followed. The trial court in granting that motion found two things. First, that the enforceable agreement and second, that the agreement did not violate the statute of frauds. The therefore the issue of appeal exactly what those findings are a whether or not parties entered into an enforceable agreement and second or be whether that agreement violates the statute of frauds because of the issues on the floor so narrow facts. The relevant facts in this case were also very narrow, and those facts are basically what occurred during that deposition and immediately after. Those facts are contained in the transcript of the deposition of defendant as well as the affidavit. So there was at the time of the hearing, there was no on the hearing on motion to enforce the agreement. There was no evidentiary hearing. So there wasn't any further testimony about anything that happened at the deposition. So we're to the pair transcript itself in that regard. Yes, which leads to my standard of review. Uh, because the facts are so limited, I'll reiterate on just very quickly. The enforceability of the contract depends upon what occurred during that deposition is that the defendant can be about this question regarding the transfer of property to her. She was repeatedly asked questions multiple times. Same question over and over. She repeatedly answered that to the best of her ability, or she said she didn't understand the question. She couldn't answer. She was bombarded with these questions times. Mhm. At one point in time, plaintiff's attorney provided the defendant the P tax. The P tax form had very fine print. The defendant could not read that fine print plaintiff's attorney provided magnifying glass. And when she read the fine print, it recorded the crime of perjury and what the penalties of that work. Also, is that in the transcript? Yes. Also, when the defendant was having problems answering the questions where she said she didn't understand it, she couldn't answer it. Plaintiff's attorney threatened their sanctions. At some point in time, there was a break in the record and according to the affidavit of defendant plaintiff's attorney and defendant's attorney exit the room. Plaintiff. Our defendant then stated in her affidavit that through the wall she could hear plaintiff's attorney yelling about getting her perjury. The defendant stated in her affidavit that she was nervous, upset. She didn't understand what was going on. She was confused. Defendant's attorney and plaintiff's attorney reentered the room. At that point in time, defendant and her attorney exited the room. She tried to ask her attorney questions. He would not explain what was going on. He wouldn't assist her, wouldn't hate her. Her attorney stated that if she didn't cut her losses, she would have to pay plaintiff's attorney's fees. She asked defendant asked how much that was. Her attorney told her it was about $20,000. Just prior to that, the affidavit says that her attorney had provided her estate for an additional $12,000 in attorney's fees. But why did she at the settlement agreement or settlement conference in the attorney's office agree to the settlement? Well, your honor, it's our contention that she did not in fact agree to it. Uh, the agreement, the are you looking ahead and you're looking at the nod and the positive in the word? Yeah. Is that what I understand? Yes, that's what she said. That is the extent of the agreement. And you have to take that. That was a court reporter taking it down. Can that be a writing? Well, your honor, in some cases it can and some it can't. But it's our contention that you have to take what happened in context with what happened before. Uh, no, no. The head can be interpreted in various ways. In trial court, the judges don't allow a nod of the head to go on. There has to be an affirmative and quibble answer because nods of the head that can be interpreted differently depending on who's who's looking at it. It's just not an affirmative answer. But she was represented by counsel. You know, no question about it. During all of this discussion about the agreement, her everybody left believe an agreement had been made. At least certainly the two attorneys did, didn't they? You're correct, your honor. But if you look at the affidavit defendant, she believed it was just a proposal when when she took a break and went out with her attorney, she had not been privy to any settlement discussions. Then when she comes back in according to her affidavit, that's when plaintiff's states that they have had an agreement. So she wasn't in front of her. The statement was made. We have an agreement. And so she was there. She had the opportunity to say, Wait a minute. No, I haven't agreed. She didn't do that, right? I guess it her understanding of what was occurring at that point in time, whether it was an agreement, whether it's a proposal would be the answer to that question. And according to the record, her understanding is that it was just both that it can be viewed different ways. But there was a discussion about this is how much is gonna be paid. There's gonna be a closing. Closing is gonna be on this date. $5000. You're gonna get $5000. All that was said to her on the record, right? But I think simultaneously when that was being said, the record indicates that plaintiff's attorney was shuffling papers trying to survey that was marked. Well, he was interjecting some points of time, and the defendant states that she sometimes couldn't hear what plaintiff's attorney was saying. But our main gist, our main argument is that statute of fraud is in place to prevent exactly. You know, you go into the bank and to borrow money and you sign a note or whatever or agree to pay. I mean, can you come back out later and say, Well, the banker was shuffling papers and I didn't quite understand and didn't know I was gonna have to repay this loan. Understand what I'm saying? I mean, I mean, isn't it pretty normal for settlement agreements to be made sometimes at discovery depositions put on the record? Settlement agreements, yeah. But this especially involves sale of land, and that's what the statute of fraud is there for. We haven't gotten there yet, I don't think. Now, there are cases that say that settlement agreements that are written on the record are an exception to the statute of fraud. And the trial court cited those cases in its written docket. But those cases all involve special circumstances that didn't apply in this case. They were under the court's supervision. They were, the court was aware of what was going on, was able to see that the parties understood what was going on. They supervised and made sure that the parties were acting fairly and that the parties understood the scope of the agreement. And that didn't happen in this case. But she agreed to show up in court to effectuate the settlement. They picked a date that we're going to go conclude this settlement. Why would she agree to that if she didn't believe there was a settlement? She could have said, wait a minute, I don't need to go to court, we don't have an agreement yet. Well, I don't think the record indicates why, but I think you could infer that she thought it was just a proposal, and then she could mull it over until that time. At the closing is where all the documents would be signed. The deeds are signed, the P-Tax is signed. That's where all the documents are signed, and that's when the agreement would be finalized. So the only difference is that she thought she had it until that time. And I mistake. It wasn't in court. They were going to go to the attorney's office. I apologize for that. But back to the transcription, that didn't occur in this case. It was in the course of the deposition, which are inherently adversarial, plaintiff's attorney, very skilled, knowledgeable, a good negotiator. And this is just a general member of the public. The deposition became argumentative. She states she didn't understand what was going on. But she's represented by counsel. Correct, Your Honor. All right. And then there's a case in our brief about how the behavior of plaintiff's counsel can also go towards the lack of enforceability of the contract. If the plaintiff's counsel is not rendering assistance, taking on fair financial advantage or making misstatements, then that all goes to what the party understood or believed or what the party's intent was in entering into the agreement. But... I mean, just to say again, my understanding of the status of the record, I mean, we have the discovery deposition. Yes. What happened there. And we have your client's affidavit. Yes, sir. Nobody else filed any affidavits, right? I believe the defendants, Barbara L. Mitchell and Eleanor L. Cherry, filed affidavits. And what did their affidavits say? I'm not sure, Your Honor. But they weren't about what happened at that discovery deposition. No, they regard the initial transaction of the conveyance of the 10 acres or whatever to the defendant can be about. But at the discovery deposition, according to your client's affidavit, she and her attorney went outside together and discussed what was going on. And she had the opportunity to talk to him then about what's happening. Well, that's true in a sense. But if the context of it was that the plaintiff's attorney was not quite rendering the assistance that our defendant needed at that point in time, telling her that she was going to owe the plaintiff's attorney $20,000 in attorney's fees while he had just previously sent her a bill for $12,000. But he's telling her what the potential outcomes could be. Right. What's wrong with that? Isn't that something he should do? He should, yes. But another thing, there's nothing in the record that says that the defendant participated in a settlement discussion. So the only inference that can be made is that the defendant's attorney didn't participate in the settlement discussion outside her presence. And there's nothing in the record that says the terms of that agreement were conveyed to her and that she agreed to those actual terms. Now, it's true that the terms were stated on the record, but… In her presence. Exactly. But there's also what was going on with her attorney shuffling papers. She said she didn't understand, couldn't hear everything. And then she nodded her head, whatever a nod was, and said, yeah, in whatever tone and tenor that may have been, to the proposed date and time for a closing. Now, we don't – the yeah may have been said with a whimper or a sob because her free will's been strengthened, but we don't know. And we don't have anything in the record to tell us either way. Exactly. Okay. So – but the record does indicate what occurred before and what occurred immediately after. Immediately after, she went to her attorney and said, I want to reject this proposal. And that's when she informed – she was informed, oh, you've entered into an agreement. She said, no, I haven't. I thought it was a joint proposal. Her attorney made a withdrawal. She goes to speak with other – I mean, obviously, he thought an agreement had been made. Right. And then you get into whether or not what he does can bind her through his authority to do so. But – Maybe you better move to the statute of frauds before your time runs out. Back to the case with regard to the statute of frauds, the only exception that may apply in this case would be the reading the agreement onto the record. Now, the court did cite the Rose and Coleman case to extend the exception of the agreement being read in open court or in a judge's presence to the case of a deposition that is not under the court's supervision. The trial court applied that and found that it did not violate the statute of fraud. But it's our contention that if you look at the facts of those cases, they are readily distinguishable from the facts of this case. There was not that situation. The statute of fraud applies. This is a transaction of land. The money would be conveyed from one party to another for valuable consideration. So there's no doubt that it applies. The only – It's very common for cases to get settled at discovery depositions and a record to be made of all the terms of that settlement agreement, including conveying real estate. Would all of those that occur at a discovery deposition also violate the statute of frauds? Well, Your Honor, I think it would under the cases that the trial court relied upon. But I think also maybe in those cases that you're referring to, it is definitively established that the parties understand what the agreement is. It is their agreement. They're exercising their free will in making that decision. They understand what the scope and parameters of the agreement are, and that's what they want to do. Now, in this case, you don't have those statements. You don't say, now, Ms. Bebock, do you understand what is going on? And this is your agreement. This is what you want to do. All you have is the nod of the head, which can be interpreted in various manners. Yeah. So I think that's – this case is what separates it from those divorce cases that you referenced, Your Honor. The – now, the statute of frauds, how it also applies is that it ensures that what took place during the deposition doesn't occur. The statute of frauds wants to make sure that valid contracts are enforced and that those contracts are the product of a person's free will and that it should be enforced. But when you take a look at what happened during the deposition with the repeated questions, the threat of sanctions and perjury, the statements by the plaintiff's attorney that she was going to have to pay the $20,000 to the plaintiff's attorney, the statute of frauds is there to protect against that, to make sure that the contracts are the product of free will and that they're in the right parameters. Now, in addition to the statute of frauds, the defendant believes there are additional grounds to render this contract unenforceable. The lack of meaning in the minds, the record indicates through the defendant's affidavit that she didn't understand what the plaintiff's attorney was saying in the agreement. She wasn't privy to the agreement when it was made. She was being distracted. She was upset.  She rejected the proposal. She never accepted $5,000. The defendant also contends that before the alleged agreement was entered into, she was subjected to progress and coerced into this agreement. And all those facts that I've stated before would, we believe, lead to that conclusion. Now, because the defendant was not privy to the settlement agreement and did not enter this agreement, I guess the only assumption is that her attorney somehow broke the deal. If he broke the deal, then he needed to have the express authority to do so. Now, there's nothing in the record that indicates that that was the case. And contrary to that defendant's affidavit, her attorney did not have the authority to enter into a binding agreement. Wow. Now, after the deposition, when the defendant obtained the advice of other counsel, she promptly contacted her attorney and said, Hey, I don't want to do this deal. Does the record reflect when that happened? It was the day after the deposition, I believe. It wasn't like 10 minutes later or half an hour later? It was the next day? The night after the deposition is when she contacted other attorneys. The following morning is when she contacted her attorney. And that's when she said, Hey, I don't want to do this. And that serves a dual purpose. First, it tells the plaintiff that the defendant never believed there was an agreement. She thought it was a proposal. She always thought she had the ability to reject the proposal, offer an acceptance. She didn't accept it. Second, she put the plaintiff on notice that, Hey, my attorney never had this authority. I did not give him the express authority to enter into a binding agreement. And the defendant, like I said previously, the defendant's actions were all supportless. She immediately repudiated the acts of her attorney. She rejected the proposal. She did not attend the closing. She never accepted $5,000. But taken as a whole, the fact that there was no writing signed by the defendant, the allegations of duress, coercion, and the lack of immediate compliance, all these taken together are what the statute of frauds is designed to protect against. It's designed to ensure that the parties know what they're getting themselves into. And in this case, the record indicates the defendant did not know what she was getting into. She did not understand what was going on. She did not think she was entering into an agreement. And she didn't. And for those reasons, we would ask that this court reverse the trial court's order of January 3rd, 2011. Okay, thank you, Mr. Whitty. All right, Ms. Jackson. May I please support the counsel? I'd like to start out my argument by getting into more of the facts of the case in court with Brown. I think it's important how the settlement came to be, and I think that warrants some time spending. I asked you to speak up just a little bit, Ms. Jackson. Oh, I'm sorry. The microphone doesn't amplify, it only records. What led up to the settlement, I think, is very important to the case. And for the reason, throughout the defendant's brief, she alleges that there was coercion and duress and that she was under an extreme amount of stress. It's important for the court to understand why Tammy Bebout stood to gain. The subject of the lawsuit, why she stood to lose. Back in 1998, she paid $5,000 for nine acres of ground. She didn't stand to lose this ground. Why she stood to gain was one acre of ground in a house built after 1984 for the price of $5,000. The claim is that there was a mistake in the deed. Right. That acre should not have been included. That is correct. And it was tracked back through more than one transaction. That is correct, Your Honor. A misdescription or whatever. Yes. That's not disputed. No, that's not disputed. Throughout Tammy Bebout's brief, she wants to impress upon the court that Attorney Wilson did something wrong during the deposition and was grounding her, coercing her, but that's just not the case. A clear reading of the deposition shows that Tammy Bebout is the one that did something wrong in the deposition. Most of the time, depositions turn transcripts, read flat, can't get a good feel for the party and their agenda. This transcript is transparent. You can see what's going on. And Tammy Bebout is trying to avoid giving a truthful answer. Attorney Wilson simply tried to get her to answer a simple question that's the crux of the lawsuit, which is whether she was buying 10 acres and a house for $5,000 back in 1998. She continuously refused to answer this question. She refused to answer whether she thought she was purchasing the house, even when confronting with evidence that she paid taxes on the house for, or I'm sorry, paid taxes on nine acres since 1998 for the time of the deposition. She refused to answer the question, even after being confronted with a P-tax, which showed that she was buying a vacant lot. Also before the court and in the record are the affidavits of Barbara Mitchell and Eleanor Cherry, who are the people that sold the ground to Tammy Bebout. In their record, it's clear that they did not own the house. They did not own the one acre, and they sold nine acres to Tammy Bebout. She just simply refused to answer the question. So the stress and duress that she claims, it's all her own doing. There was a break in the deposition, which you can read, and that was because she was not answering the question. The threat of sanctions, threat of court intervention, all that is legitimate because if you do not answer the question, there are Supreme Court Rule 206, I believe in 2019, allows for court intervention and for supervised deposition. The other thing that was discussed by Mr. Whitty is Tammy Bebout's affidavit. That affidavit is referred to through the briefs in the argument. The affidavit is self-serving and belies what's clearly in the deposition transcript. Paragraph 5 of her affidavit talks directly about the questions that were asked by Attorney Wilson that Tammy refused to answer and attempted to circumvent. Paragraph 6 and 7 deals with the possibility of her committing perjury. It's clear from the deposition what's going on, and it doesn't coincide with her affidavit. But if there was this agreement made with her attorney present, why did the next day she hire or consult another attorney? Well, because she wanted to get out of the agreement. I mean, she wants this house and the one acre of ground for $5,000. She's in a windfall situation. I mean, throughout her affidavit, she pleads ignorance of what's going on, but that's not what happens. A reading of her deposition, I've got it summarized in here. Page 34 of the deposition is where the settlement agreement begins. Attorney Wilson recites for the record the settlement agreement and submits a survey of the property to the court order. Attorney Porn on that page states that's fine. Tammy Bebout is sitting right there by her attorney. Page 35, the deed that's going to be transferred is discussed with input by Mr. Porn. Tammy Bebout is present then. The November 13th date is decided upon for her to come to Attorney Wilson's office to transfer the deed for $5,000. Tammy Bebout is still sitting right there by her attorney. A time is decided on. Her attorney looks at her. Tammy Bebout is asked by Attorney Porn if any time is okay. She indicates it's okay. Verbally indicates it's okay. It is then confirmed on the record that settlement will be performed at noon on Friday the 13th. Noon on Friday the 13th? Yes. That should have been our first. An omen there, wouldn't it? Yeah, exactly. Attorney Porn asks his clients, is that okay? The transcript said, Tammy Bebout nods head in the positive and states yeah. When you nod your head in the positive, you go up and down. When you nod your head in the negative, it's yes or no. That's very clear. She says yeah and nods head in positive. She says yeah, not yeah right, not hey what's going on, but affirmatively nods her head yes and says yeah. Then on page 36 of the deposition transcript, Attorney Porn asks Attorney Wilson if he will prepare a stipulation for dismissal. In order for dismissal, she's still sitting right there beside her attorney during this whole process. The transcript reads clear as a bell and does not belies what she says in her affidavit. And further attached to her affidavit is the letter of Mr. Porrent that Tammy Bebout attaches this letter to her affidavit. It's the letter from Mr. Porrent to her after she rejects the settlement and she's going to think on it for a day. It's not as if, according to this letter that she attached, it's not as if she came out of the gate saying, oh Mr. Porrent, I didn't understand, you're doing wrong, this is not what was supposed to happen. Mr. Porrent states, you then told me you wanted to wait overnight and think about it. I'm sorry, read that to me again. You then told me you wanted to wait overnight and think about it. And when we spoke Friday morning after you told me you were sick, you immediately told me that you had not decided to take the deal. She knows there's a deal, it's just that she decides she doesn't want it. But that deal is on the record. How much time was going to pass between the deposition and the closing? The deposition was on November 11th in the morning hours and the closing was going to be at noon on the 13th. So two days. Two days. So it was coming up pretty fast. It was. And there's no dispute that the real estate transfer declaration says unimproved. Is that correct? That is correct. And there's no dispute that she paid taxes on nine acres from 1998 through the time of the deposition. In her brief, she goes on about how stressed she is and how expensive the litigation is. And that's true. Litigation is stressful under normal circumstances. It's expensive under normal circumstances. And when you're in a situation like this, when you read the transcript where she's refusing, avoiding, will not answer the question about this house, that causes it to be doubly stressful, I'm sure. But that's through no fault of plaintiff's attorney. That's her fault. And the question does go to the heart of litigation. If she answers, no, I never thought I bought that one acre, the game's over, right? It's over. We believe the trial court was correct in its ruling that the settlement agreement does not violate the Section of Fraud. There's two reasons. The settlement agreement was reached and read into official record. Three officers of the court were present, a court reporter duly licensed by the state of Illinois, and believe the signature requirement is not a literate requirement. And there's several cases that say that. In the Kalman case that's cited in the briefs, the settlement agreement involves specific performance of a real estate contract. The settlement was negotiated by the parties that stated it. It was stated in open court, which is the difference from our case. But the court found that the court testimony had no signature, but the only purpose of the signature was authentication. And that, in the case of Kalman, is amplified by the admission by the party that they were entering into the agreement. We have the same thing here. She said, when asked about the settlement agreement, it's okay. She nods her head in affirmative, agrees to show up on November 13th. She's sitting there the whole time. Everything is read into the record. She had ample opportunity to stand up and say, hey, what's going on? She didn't do that. She agreed to show back up at Attorney Wilson's office on November 13th. The other case cited by the trial court is Rose v. Mavrakis, and that involved a contract that could not be performed within a year. And in that case, the parties reached an agreement during the court-sponsored settlement conference. That wasn't even read into the record. And the court stated in Rose that the purpose of the writing requirement is not to repudiate contracts that have, in fact, been made, but only to prevent the fraudulent enforcement of the sort of contracts that were, in fact, made. In the instance case, it's clear that a contract was made. It was read into the record. She was under oath and agreed to it. There are so many exceptions to the statute of fraud and the literal requirement. As I mentioned, we have the agreement stated in the judge's chambers on Rose, agreement made and reported in open court with the agreement of the party to be bound under oath. That's a comment that I mentioned. There's cases about a memorandum of an auctioneer takes the case on statute of fraud. And in the reply brief by the defendant, they seem to think our argument is that the court reporter stood in the place of the auctioneer. But that's simply not the case. We're just saying that there are certain exceptions to the statute of fraud. It does not have to be the writing doesn't have to be literal, nor does the statute. There's also a case referred to that's caught. It's a California case, and that's referred to in the briefs. And that indicates a court-supervised conference, whether on the record or not, can come outside the statute of frauds. The defendant cites several cases stating that her attorney did not have authority. One of the big ones is Brewer. Brewer is not illustrative of what happened in our case. And the way it's cited in their brief, it's not actually what happened. Brewer states, according to the defendant, that the record contains affirmative or contradictive evidence that plaintiff did not expressly authorize his attorney to agree with the plaintiff. Sorry, let me back up. I've got horrible handwriting. The Brewer case involves an affidavit by the plaintiff in that case that says that his attorney did not have the authority to enter into an agreement where the plaintiff would quit his job. This agreement took place in a court-supervised settlement. The difference with that and with our case is the plaintiff was not with the attorney at this time. The difference in that case and our case is the plaintiff did not say that he—I'm sorry, that the plaintiff's attorney did not say that he had authority to represent that the plaintiff would quit his job. But the court assumed, according to the case, that the plaintiff's attorney had authority and indicated that the plaintiff did state that he had authority, although the plaintiff—or, I'm sorry, the plaintiff's attorney had authority, although the plaintiff's attorney denied this. So the big difference is Tammy Bebout is sitting right beside her attorney when this is going on. That's not what's going on in Brewer. This is an attorney out, away from his client, saying, okay—or at least according to the court, saying, okay, if we enter into a settlement agreement, my client will quit his job. The other case that is stated for the proposition that he didn't—the attorney court didn't have authority is the Danziger v. Pittsfield Shoe case. And Danziger involved a contract where a check was issued to satisfy a claim. There was no interaction between the plaintiff and the plaintiff's attorney and the defendant and the defendant's attorney in the same room. This is, we sent the check, they accepted the check. So that's totally different than what we have here. They also cite Clark v. Clark, which is a family law case where the attorney for the party withdrew during a court appearance, a petition, and settled the case. Her client wasn't there. So these are all different. Tammy DeVal was sitting right there by her attorney and had every opportunity to either not agree to the settlement agreement or speak up and say, hey, I don't understand what's going on. Instead, she nods her head in the positive and she says, yeah, and then she agrees to show up on November 13th. In the reply brief, the appellant asks the court to consider three questions. One was their clear acceptance of the agreement of compromise and acceptance by Tammy DeVal personally. That's contained in the deposition. All you have to do is read the deposition. I don't think she gets to use her self-serving affidavit because she was right there. The Brewer case is the one that says, okay, you can use this affidavit. But in the Brewer case, she wasn't right there with her attorney. The second question that the appellant asked the court to consider was there a meeting of minds between the plaintiffs and Tammy DeVal as to the terms of the settlement compromise. Well, according to the deposition transcript there was, according to the plaintiff's attorney there was, according to the defendant's attorney there was, again, we have that David and Tammy DeVal saying, oh, no, no, there wasn't. I had no idea what was going on. There wasn't a whole lot to it, was there? You pay me $5,000. I sign a deed. The case gets dismissed. That's it. It's contained in three pages of the deposition transcript. And then finally the question that she, Tammy DeVal, asked the court to consider is the oral agreement compromise and settlement unenforceable due to the statute of frauds. The answer is no. The agreement is outside the statute of frauds because there are exceptions to the statute of frauds. There's a list of exceptions listed in the briefs. Well, I mean, kind of the issue to me is, I mean, we have a lot of cases involving real estate, divorce cases, whatever, you know. But if an agreement is made to settle and part of that agreement is I'm agreeing to sign a right, isn't that agreement enforceable, the agreement to settle the case? That's our contention. And I think the case law reflects that. There is one case that we cited in our brief that has nothing to do with a settlement of real estate, a settlement regarding real estate, but it has a very good discussion about the statute of frauds in all different ways that there are different kinds of writing, different types of signatures, how things can go outside the statute of frauds. So that's why that's cited. There's a several page, well, I think a page and a half discussion about that in there. So it's plaintiff's contention that the agreement under O was her agreement to sign, and it's just as good as a signature. Thank you. Was there any evidence of who drafted the deed and a concession that the fact that it said 10 acres was in error? I'm sorry? Was there anything in the record that confirmed who drafted the deed and confirmed that it was in error because it said 10 acres instead of 9? Not specifically. In the complaint, it is alleged, and we go through a timeline from back in the 30s and what actually happened. There is the affidavits of Barbara Mitchell and Erilyn Moore Cherry because they inherited this land from their father, and they always thought they had 9 acres because that's what they always thought he had. So there was nothing affirmatively in the record about who drafted the deed, and there's no admission in the answer that, yes, it was in error. But the sellers of the property, 2 Tampa D-Val, who are parties to the lawsuit, signed the affidavit and said all they ever owned was 9 acres, all they ever paid tax on was 9 acres. I think it says that. The P-tax form was 9 acres, and they had no intention of selling her 10 acres with the house because they didn't own that. That belonged to Mary Thompson. Ownership of the 1 acre was still in dispute. Otherwise, there was no need to settle, right? Ownership of the 1 acre, that was the dispute. And a little more background is stated. I want to make sure I don't get on what's in the record. But a little more background is that this never came up until Mary Thompson, one of the plaintiffs, got a survey and found out that there was a problem. Tampa D-Val never alleged there was a problem. This suit was brought by Mary Thompson and her daughters to correct the deed, which was never in dispute until they realized there was a problem. There was a title problem. Yes. Cloud on the title, whatever. All right. Thank you very much, Ms. Jackson. Mr. Witte, any rebuttal? I just have a few things. There's been a lot of discussion about the underlying facts of the initial transaction. It's our opinion that those facts are kind of relevant to the issue of whether or not the enforceable agreement was entered into at the close of that deposition. Also, plaintiff's counsel is really urging this court to extend that exception in the statute of frauds that was established in the common case to this case. But I think I've adequately distinguished those facts. But just there's a quotation here from that case, and I don't have the page cited. But that case says, the defendant repeatedly answered affirmatively when questioned by the trial court about whether he understood the settlement and had agreed to it voluntarily in an absence of any mistake of fact or law or misunderstanding which would justify upsetting the agreement. That is why there's that exception that was established in the common case. That is not present in this case. Your Honor, you also asked about whether an agreement to sign the documents would be enforceable. It's our opinion that no, it would not be because the consideration would not be present for that agreement. The consideration is for the transfer of the property. There would be no consideration available for the agreement to sign the documents. And we think that that agreement would fail for lack of consideration. Plaintiff's counsel also referenced the letter in which the defendant expressed to her attorney that she wanted to take a few days to sleep on it and think about the proposal. Because that's what we, that's what the defendant thought and that's what we believe was the proposal. She thought it was a proposal. She thought she had a couple days to sleep on it to make up her mind. You cannot sleep on a contract that has already been created. It's done, it's over with. With a proposal, yes you can. For those reasons, and that's the end of my rebuttal, which is very short. But for those reasons, we would ask that you reverse the trial. Thank you. All right, thank you, Mr. Whitty. Thank you both for your briefs and your arguments. We're going to take this matter under advisement. We'll render a decision in due course.